MIRANDA KANE (CA Bar No. 150630)
GRACE YANG (CA Bar No. 286635)
**CONRAD | METLITZKY | KANE LLP**
217 Leidesdorff Street
San Francisco, CA 94111
Tel:   (415) 343-7100
Fax:   (415) 343-7101
Email: mkane@conmetkane.com
Email: gyang@conmetkane.com

Attorneys for DEFENDANT
ERIK GONZALES

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>ERIK GONZALES,<br><br>    Defendant. | CASE NO. 19-CR-00585-HSG<br><br>**DEFENDANT ERIK GONZALES'S SENTENCING MEMORANDUM**<br><br>Date:        October 16, 2024<br>Time:       2:00 p.m.<br>Judge:      Hon. Haywood S. Gilliam<br>Courtroom: 2 |

**I.  INTRODUCTION**

Mr. Gonzales's transformation during the almost-five years since his arrest has been both stunning and inspiring. Mr. Gonzales accepts full responsibility for his crimes, but also traces his poor decision-making to his deep-seeded childhood traumas and his reliance on opiates to cope with that trauma. At the height of his addiction—during the course of the charged conduct—Mr. Gonzales would have said anything in his desperation to obtain opiates to manage his real and perceived pain. Today, he does not recognize that person. Mr. Gonzales is sincerely grateful to the Court for giving him the opportunity to demonstrate the extent of his change by allowing him to design and participate in a deferred-sentencing plan modeled after the Conviction Alternatives Program ("CAP"). Mr. Gonzales continues to successfully manage his drug addiction with Suboxone, and now that he is participating in cognitive behavioral therapy ("CBT"), Mr. Gonzales has achieved what many in his position can only dream of: the ability to live a law-abiding life, hold a full-time job, and enjoy healthier relationships with his family. A prison sentence now would threaten all of Mr. Gonzales's remarkable efforts. Therefore, he requests that the Court vary downward from the indicated Guidelines range and impose a time-served sentence with three years on supervised release.

**II.  PROCEDURAL BACKGROUND**

Mr. Gonzales was arrested on November 13, 2019 and placed on pre-trial release on November 19, 2019. Dkt. Nos. 5, 23. The matter was originally venued in San Jose and assigned to Judge Lucy H. Koh. After several continuances and status conferences during the COVID-19 pandemic, as well as Judge Koh's elevation to the Ninth Circuit, the case was reassigned to this Court on January 20, 2022. Dkt. No. 102. Undersigned counsel was appointed on August 25, 2022, after his original attorney withdrew. Dkt. Nos. 193, 194. Mr. Gonzales entered into a plea agreement on December 7, 2022. Dkt. No. 281.

On March 15, 2023, at defense counsel's request and over the government's objection, the Court referred this case to Judge Edward J. Davila and the San Jose CAP team to assess whether Mr. Gonzales

was a suitable candidate.[1] Dkt. No. 307. Mr. Gonzales was not deemed a good fit for CAP due in part to the fact that he had been successfully managing his addiction with Suboxone for several years by the time he was evaluated, and also because of his myriad of mental health needs.[2] However, Judge Davila emphasized that the San Jose CAP team believed Mr. Gonzales could be a viable candidate for an incarceration-alternative program and that the CAP team's decision did not necessarily mean a prison sentence for him. *Id.*

Accordingly, with the assistance of Pre-trial Services, Mr. Gonzales proposed a robust deferred-sentencing plan with substantial mental-health counseling and resources to address his deep drug addiction. The Court approved that plan in December 2023. Dkt. No. 354. Mr. Gonzales has since been diligently executing the various steps outlined under the plan. In Pre-trial Service's August 21, 2024 memorandum to the Court, Mr. Rangel indicated that Mr. Gonzales had substantially completed all his goals.

### III. FACTUAL BACKGROUND

A. Personal History

1. *Untreated Childhood Traumas*

Mr. Gonzales was born in Salinas, California. *See* Presentence Investigation Report ("PSR") ¶ 57. He never met his biological father. *Id.* When Mr. Gonzales was born, his mother Sally persuaded her then-husband Reuben Sr. to raise Mr. Gonzales as one of his own children. *Id.* ¶ 58. However, Mr. Gonzales's childhood was a painful one filled with one untreated trauma after another.

When Mr. Gonzales was about four or five years old, an older neighbor began molesting him in exchange for food. This abuse continued unchecked for approximately six months. *Id.* ¶¶ 60, 115. Mr. Gonzales's older half-brother Reuben Jr. was aware of this abuse, but as a child himself at the time, he could not stop it. *Id.*

---

[1] The United States Attorney's Office was not participating in the CAP program at the time of Mr. Gonzales's arrest in 2019, therefore he was not assessed at that time.

[2] Notably, the CAP program has recently created a second-tier program for eligible defendants with less acute needs who, like Mr. Gonzales, have made progress in their recovery journey at the time of their arrest and assessment.

Another much older half-brother named Ricky also abused Mr. Gonzales. *Id.* Ricky forced Mr. Gonzales to smoke marijuana starting at age eight. *Id.* ¶¶ 60, 68, 78. Ricky also locked Mr. Gonzales in the kitchen cabinet repeatedly, often for hours at a time, and beat him and Reuben Jr. with a hanger or a vacuum cleaner belt. *Id.* Ricky's abuse continued for years, until Reuben Jr. grew big enough to protect himself and Mr. Gonzales. *Id.* ¶ 60.

By the time Mr. Gonzales was about six or seven years old, Reuben Sr. left his mother to be with another woman. *Id.* ¶ 58. Reuben Sr.'s girlfriend repeatedly chided Reuben Sr. in front of Mr. Gonzales, saying he was not "not your real son." *Id.* Eventually, the girlfriend gave Reuben Sr. an ultimatum—choose either her or his family. *Id*. Reuben Sr. chose the girlfriend, divorced Sally, and left behind Mr. Gonzales and Reuben Jr. *Id.* Mr. Gonzales was devastated to be abandoned by the only father he had ever known. *Id.*

After the divorce, Mr. Gonzales lived in a one-bedroom trailer with his mother and Reuben Jr. *Id.* Though she tried her best, Sally struggled to support her sons, both financially and emotionally, and the two boys would go without food at times. *Id.* ¶ 68. Sally was not home much, because she was always working. *Id.* ¶ 58. She also suffered from depression for which she self-medicated with alcohol. Worse, Sally began a new relationship with a violent partner Danny, who would repeatedly punch and hit her, as well as threaten her with a firearm in front of Mr. Gonzales and Reuben Jr. *Id.* ¶ 59. This violence spanned years. *Id.* Additionally, Danny abused drugs in front of Mr. Gonzales and Reuben Jr. during this time. *Id.*

In the sixth grade, during a sleepover at his friend's house, Mr. Gonzales witnessed his friend's father stab his wife repeatedly in the chest, and then stab himself in an attempted suicide. *Id.* ¶ 60. The wife died, but the husband survived, and he was later tried and convicted for murder. *Id.* Mr. Gonzales testified at the husband's trial. *Id.* Sadly, this was not the only visceral experience that Mr. Gonzales had with death at a young age. One of the boarders to whom Sally rented a shack outside their trailer was an alcoholic and he died in front of Mr. Gonzales from alcohol poisoning. *Id.* ¶¶ 59, 60. Mr. Gonzales never received any counseling or therapy to help him process or cope with any of these traumatic events.

### 2. *Young Adulthood at the Free Life Church*

When Mr. Gonzales was 17 years old, a judge ordered him to live at the Free Life Church in Salinas instead of a juvenile facility. *Id.* ¶ 63. Life at the church was strict and isolating, and upon Mr. Gonzales's later reflection, like "a cult." *Id.* Mr. Gonzales was forbidden from having contact with his family and was not allowed to leave the church premises unaccompanied. *Id.* The church also mandated that Mr. Gonzales participate in an intense work program, and required him and Nadine Salas, who later became his wife, to "live a certain way." *Id.* ¶ 64.

Eventually, Mr. Gonzales and Nadine left the church and had two children, Matthew and Marisa. *Id.* Later in their marriage, Nadine began drinking heavily and abusing drugs, which led Mr. Gonzales and Nadine to divorce. *Id.* After that, the children chose to live with Mr. Gonzales, and to this day, he maintains a good relationship with both. *Id.*

### 3. *Martial Arts and Drug Addiction in Later Years.*

Starting in his twenties through his late thirties, Mr. Gonzales began training and competing in various martial arts, including wrestling, Muay Thai, Brazilian Jiu Jitsu, and Jeet June Do. *Id.* ¶ 80. These years of martial arts took an excruciating toll on Mr. Gonzales's body. He sustained several serious injuries that resulted in a slipped disc and a pinched nerve in his back, which left him with severe, chronic pain. *Id.* at 30.

Because of those injuries, and to continue competing in martial arts, Mr. Gonzales began seeing doctors to help manage his chronic pain. *Id.* ¶ 78. These doctors prescribed him high doses of Oxycodone and Hydrocodone, and in increasing amounts. Ultimately, Mr. Gonzales developed a heavy and debilitating addiction to opiates. *Id.* One of Mr. Gonzales's prescribing doctors was his co-defendant, Dr. Deane Crow.

### 4. *Severe Substance-Abuse, Physical, and Mental-Health Issues*

There is no dispute that Mr. Gonzales is a drug addict in an ongoing battle against the pull of opiates. His substance abuse began early in his childhood, when he consumed alcohol and smoked marijuana. *Id.* Mr. Gonzales had also used cocaine, methamphetamines, and more recently, Oxycodone and Hydrocodone, after becoming addicted to opiates in his twenties. *Id.* After his arrest in this case, Mr.

Gonzales began working with an addiction doctor who prescribed Suboxone. *Id.* ¶ 79. Mr. Gonzales understands that as a result of his heavy usage level, he will likely be Suboxone-dependent for the rest of his life.

In October 2023, Mr. Gonzales was diagnosed with Graves' Disease, a severe autoimmune and hyperthyroidism illness, one of the effects of which is an overactive thyroid gland that has caused him to lose more than 30 pounds at various points—at his lowest he has weighed less than 140 pounds. *Id.* ¶¶ 71, 72. Graves' Disease also causes Mr. Gonzales to suffer from involuntary hand tremors, high blood pressure, as well as a dangerously high heart rate and a range of other heart risks, like stroke. *Id.* ¶¶ 72, 73. To mitigate these symptoms and risks, Mr. Gonzales must take additional medication (though no medication can effectively eliminate any of his Graves' Disease symptoms and risks). *Id.* Since his Graves' disease diagnosis, Mr. Gonzales has started obtaining Suboxone through his primary care physician who can better monitor the interactions among all his prescribed medications. *See* Declaration of Miranda Kane ("Kane Decl.") ¶¶ 2, 3.

Unsurprisingly, the traumas from Mr. Gonzales's childhood have caused him to suffer from several serious mental-health issues throughout his life—including post-traumatic stress disorder ("PTSD"), anxiety, and depression. *See* PSR ¶ 74; *see also* Kane Decl. Ex. A (Letter from Carolina Cortez). Starting in 2019, Mr. Gonzales received counseling for the first time in his life. At the direction of Pre-trial Services, he attended virtual sessions through Valley Health Associates. Unfortunately, that counseling was not particularly productive. The sessions decreased in frequency, ultimately devolving into brief, phone check-ins that focused on breathing techniques rather than any substantive treatment of Mr. Gonzales's underlying mental-health needs. *Id.*

Only recently has Mr. Gonzales started to meaningfully address the traumas from his childhood, through cognitive behavioral therapy with a licensed therapist and cognitive-behavioral specialist. Kane Decl. Ex. A. Over the last six months, Ms. Cortez has worked with Mr. Gonzales consistently in weekly in-person sessions as part of his deferred-sentencing plan. *Id.* She reports that while Mr. Gonzales's "trauma from childhood and adolescence has resulted in [him] suffering from anxiety and depression, which he managed through substance use which led to making poor decision," Mr. Gonzales has also

- 5 -

made "significant progress in therapy," now achieving "valuable coping strategies and insights" that "foster[] a healthier mindset and reduc[e] the likelihood of relapse into negative behaviors." *Id.* It is Ms. Cortez's firm belief that Mr. Gonzales "can continue to build on these gains and work towards a stable and productive life" with continued therapy. *Id.* Mr. Gonzales considers CBT a critical part of his progress. In his letter to the Court, Mr. Gonzales writes: "confronting these issues [his traumatic past] has helped me understand the depth of my struggles, and I have made a conscious choice to heal." Kane Decl. Ex. C (Letter from Erik Gonzales).

B. <u>Offense Conduct</u>

While it is very painful for Mr. Gonzales to revisit the facts in this case, he takes full responsibility for his conduct. He also no longer recalls many of the specific details described in the PSR due to his heavy drug use at the time, but generally, he does not dispute its accuracy:

> There's a note in evidence that I don't even remember writing. I can't explain why I wrote it, but I still take responsibility for it. Reading that note fills me with embarrassment and shame because it shows how far I was willing to go to fuel my addiction. While I don't recall writing it, I'm not making excuses.

*Id.*

Initially, Mr. Gonzales worked as Dr. Crow's office manager in Salinas to get his own prescriptions for opiates. Later, Mr. Gonzales recruited patients for Dr. Crow using his mother's real-estate office as a base of operations. He helped Dr. Crow's patients fill their prescriptions for Oxycodone and Hydrocodone by finding willing pharmacies. In exchange for his assistance, Mr. Gonzales asked patients to pay him so that he could buy additional drugs for himself, or asked patients to share their Oxycodone pills. Mr. Gonzales also wrote out prescriptions for himself and his brother Reuben Jr. under Dr. Crow's authority during this time. PSR ¶¶ 21, 24. Other than working for Dr. Crow at the Modesto location for a short time, there is no evidence that Mr. Gonzales was associated with the separate criminal conspiracy involving Dr. Crow, his wife Diane Crow, or Joe Bernal. *See id.* ¶ 12. Similarly, while the evidence shows that he resold pills to fuel his habit, there is no indication that he profited such that he lived a glamourous lifestyle during the conspiracy period. To the contrary, Mr. Gonzales, who had previously had success in real estate, "drained [his] finances" to support his

addiction. *See* Kane Decl. Ex. C. Mr. Gonzales does not dispute that during the course of the charged conspiracy the converted drug weight of the Oxycodone and Hydrocodone obtained via Dr. Crow's prescriptions is at least 10,000 kilograms but less than 30,000 kilograms. PSR ¶ 21.

    C. <u>Pre-trial Release and Post-Offense Rehabilitation</u>

In the nearly five years since his arrest and pre-trial release in November 2019, Mr. Gonzales has demonstrated his ability to comply with the conditions imposed on him. Dkt. Nos. 5, 23. The Court has rewarded his exemplary conduct by incrementally removing the more restrictive conditions of his release. Initially, Mr. Gonzales was on house arrest with electronic monitoring, however, on January 25, 2022, the Court removed the home-detention condition and imposed a curfew condition at Pre-trial Services' discretion. Dkt. No. 104. Later, on December 19, 2022, the Court removed the electronic-monitoring condition altogether. Dkt. No. 285. Mr. Gonzales has not exploited these expanded freedoms and continues to be in compliance with his release conditions.

    1. *Managing His Addiction*

Most significantly, Mr. Gonzales has focused his post-arrest energies on tackling his opiate addiction. Mr. Gonzales was initially under the care of Dr. Lee Goldman, an addiction specialist at Community Hospital of Monterey Peninsula, who prescribed Suboxone to manage Mr. Gonzales's opiate-withdrawal symptoms. Mr. Gonzales saw Dr. Goldman regularly for several years to monitor his progress and make any indicated adjustments to his prescription. *See* PSR ¶ 73, ¶ 79, and 30. Remarkably, Mr. Gonzales has not had any positive drug tests or relapses.

    2. *Addressing His Mental Health Needs*

As part of his deferred-sentencing plan, Mr. Gonzales has also augmented his recovery regimen by attending at least two Narcotics Anonymous meetings a week, and talking with his sponsor twice a week. *See* August 21, 2024 Pre-trial Services' Informational Memorandum at 2. He has also begun to work on his severe mental-health needs, as identified by Pre-trial Services' Level of Service Case Management Inventory assessment. *Id.* Mr. Gonzales has weekly sessions with Carolina Cortez, who specializes in cognitive behavioral services. Ms. Cortez has helped Mr. Gonzales learn how to meaningfully cope with his PTSD, anxiety, and depression stemming from his past traumas, while

providing him with additional tools to break the pattern of substance abuse and poor decision-making from his past. *See* PSR ¶ 74; Kane Decl. Ex. A.

### 3. *His Gainful Employment*

Mr. Gonzales has made great professional strides as well. In September 2023, after submitting over 100 resumes without success, Mr. Gonzales obtained a full-time job as a sales associate at the Gilroy Chrysler Dodge Jeep RAM dealership. PSR ¶ 83; *see* Kane Decl. Ex. C. Because of his exemplary sales performance, Mr. Gonzales was promoted to assistant manager at another car dealership in Morgan Hill that seemed to offer greater opportunities for career advancement. PSR ¶ 83. However, Mr. Gonzales left the Morgan Hill dealership after the manager there implied in front of other staff and customers that Mr. Gonzales's hands trembled because of drug use (when in fact, his hand tremors were caused by his Graves' Disease). *Id.* Undeterred, Mr. Gonzales quickly secured a contract position with Zeitview. Recently, he returned to work for his old manager at a different car dealership in Gilroy, where he has continued to excel in sales and is highly regarded by his colleagues. *See* Kane Decl. Ex. B (Letter of Anthony Sida). Mr. Gonzales's career plan is to continue working in sales for a couple more years, and then move into a finance role for the car dealership—which his general manager very much supports. *See* Kane Decl. Ex. C.

### 4. *His Deferred-Sentencing Plan*

Mr. Gonzales has also completed the components of his deferred-sentencing plan, including his journals and essays for Pre-trial Services, his goals for identifying healthy, educational and recreational activities for himself, and his plan to continue working with his therapist and Pre-trial Services. In sum, Mr. Gonzales has followed his individualized deferred-sentencing plan to a tee.

## IV. PRESENTENCE INVESTIGATION REPORT AND SENTENCING GUIDELINES

Mr. Gonzales agrees with the Sentencing Guidelines calculation in the PSR, which mirrors the Plea Agreement: an adjusted offense level of 31 with a Criminal History Category III which yields an indicated range of 135 to 168 months for count one and 48 months for count two.

Several of the parties' objections to specific offense conduct details remain unresolved in the final PSR. Mr. Gonzales respectfully renews his objections to the following and asks that those be stricken or corrected:

- <u>Paragraphs 10 through 12, and 16</u>: These factual allegations relate to Mr. Bernal's criminal conduct and the unsubstantiated suggestion that Mr. Gonzales was implicated in Mr. Bernal's narcotics scheme with Dr. Crow. While the government charged this case as a single conspiracy, it has always been Mr. Gonzales's position that there were at least two separate conspiracies, with Dr. Crow acting as the prescribing physician in both.[3] The government's sentencing memo for Mr. Bernal merely establishes a temporal linkage between the two conspiracies and asserts that Mr. Bernal was generally aware of Mr. Gonzales. Dkt. No. 378 at 4–5 ("During the same period, Dr. Crow was also working with co-defendant Gonzales to write opioid prescriptions … Bernal did not have direct contact with Gonzales…")

- <u>Paragraph 20</u>: Mr. Gonzales objects to any reference to the inflammatory note in the Offense Conduct section. First, there is no evidence that the note was sent, when it was written, by whom, and under what circumstances. The government's rank speculation regarding what the note "appears to be" is not enough to warrant its inclusion in the PSR.

- <u>Paragraph 58</u>: It was Reuben Sr.'s girlfriend, and not to Sally who referred to Mr. Gonzales as "not your real son." This sentence should be clarified so that the "she" is not misleading.

## V. THE 3553(A) FACTORS SUPPORT A VARIANCE TO A TIME-SERVED SENTENCE UNDER THESE EXTRAORDINARY CIRCUMSTANCES

Mr. Gonzales's dramatic post-offense rehabilitation—including his exemplary performance while on pre-trial release, his dedication to formulating and completing a deferred-sentencing plan, and his overall commitment to living a productive and law-abiding life—warrants a time-served sentence with three years of supervised release. Indeed, notwithstanding the serious offenses to which he has pled guilty and for which he has accepted responsibility, even Probation recommends a remarkable

---

[3] The parties fully briefed this issue as well as many others when Mr. Gonzales's case was set for trial. However, Mr. Gonzales entered a guilty plea before the Court ruled on them.

downward variance to 36 months imprisonment from the indicated 135 to 168 months Guidelines range. Notably, the final PSR in this case issued in January 2024, before the Court granted Mr. Gonzales's request to complete a self-styled deferred-sentencing plan under the supervision of Pre-trial Services. At the last hearing in this matter, Mr. Rangel noted that Mr. Gonzales has made impressive progress and that he was on track to achieve the goals of his deferred-sentencing plan. *See* August 21, 2024 Pre-trial Services' Informational Memorandum. Although Mr. Gonzales undertook the demanding requirements of the plan knowing that a time-served sentence was not guaranteed even with its successful completion, he submits that, coupled with all the other 3553(a) factors, he has earned the requested extraordinary variance.

A. Traumatic Upbringing and Mental Health Issues

Mr. Gonzales's childhood traumas and resulting mental health issues—in particular, his PTSD—are recognized grounds for both variances and downward departures. *See* USSG § 5K2.13; *United States v. Cantu*, 12 F.3d 1506, 1512 (9th Cir. 1993) (recognizing PTSD as a basis for a downward departure); *see, e.g.*, *United States v. Ferguson*, 942 F. Supp. 2d 1186, 1194 (M.D. Ala. 2013) (varying downward due to PTSD).

Here, there is a clear thru line: beginning with Mr. Gonzales's years of childhood trauma and abandonment, to the crushing addiction, and culminating with his poor decision-making that resulted in his conviction. Mr. Gonzales never received counseling when he was physically abused by his older brother; sexually abused by a neighbor, and abandoned by the only father he knew. Similarly, Mr. Gonzales received no assistance or victim-witness support services through the justice system when, as a child, he testified at a criminal trial as an eyewitness to the murder of his friend's mother. Although Mr. Gonzales's mother did her best, she was ill-equipped to provide the type of care and security that Mr. Gonzales desperately needed. Instead, Mr. Gonzales grew up watching his mother struggle with alcohol addiction when Reuben Sr. left her, and later witnessed her being threatened, punched, and hit repeatedly by a violent partner. While it is impressive that Mr. Gonzales never joined a gang, it is no surprise that he wound up in juvenile court. Again, rather than treat the root causes of his behavior, Mr. Gonzales was placed in a cultish "church," where he was further exploited and forced to work for his

keep. Collectively, each of these episodes paints a picture of relentless trauma and abuse, and each one of which provides grounds for a Guidelines variance. The significant strides that Mr. Gonzales has made in the relatively short time that he has been receiving counseling from Ms. Costa is an indication of his capacity for introspection, growth, and change. There is no telling what his life path might have been had he had access to these types of services as a child and teen.

B. The Need to Avoid Unwarranted Sentence Disparities

To date, no one charged in this matter has received a custodial sentence. Mr. Bernal, who graduated from the CAP program, was sentenced to time served with 3 years of supervised release on June 12, 2024. Dkt. No. 386. Brittany Cardona, whose records are largely sealed, was sentenced to two years of probation. Dr. Crow and Ms. Crow—died before the sentencing stage of their cases. And, Jessica Bravo, who was implicated in the same conspiracy but charged separately, received diversion after which her case was dismissed.

Comparisons among co-defendants are always imperfect as no two individual's circumstances are identical. Still, the exercise is revealing here as it also exposes the inherent subjectivity in the sentencing process that the Guidelines seek to avoid. Apart from the greater quantity of drugs involved, the government's account of Mr. Bernal's offense conduct is quite similar to Mr. Gonzales's. *See, e.g.*, Dkt. No. 378 (the government's Sentencing Memorandum for Mr. Bernal). For example, Mr. Bernal was an addict who also relied on Dr. Crow to prescribe opiates to himself and others. As Dr. Crow's health failed in later years, Mr. Bernal took advantage of the doctor's decline to fill in his own prescriptions using blank pre-signed pads. *Id.* at 4. Between 2013–2017 (the majority of which pre-dated Mr. Gonzales's involvement with Dr. Crow), Mr. Bernal earned thousands of dollars a month reselling pills he obtained through Dr. Crow's prescription authority. *Id.* at 5. Despite these commonalities, Mr. Gonzales anticipates that the government's description of his conduct will be significantly more sinister.

Likewise, Mr. Gonzales does not expect the government to afford him the same credit for his dedication to rehabilitation throughout his lengthy period of pre-trial release and his successful completion of his self-styled deferred-sentencing program, even though his program included the same hallmarks of rigor: a sustained period of sobriety, intensive mental health counseling, and completion of

the same journals and essay curriculum used by the Courage to Change program. Mr. Gonzales also completed his program without any violations, which the government notes is "unusual and impressive." *Id*. at 6. Unlike Mr. Bernal, who was sent to New Bridge after violating his pre-trial release conditions and before being admitted into CAP, Mr. Gonzales has not relapsed since his arrest in this matter. In recommending a time-served sentence for Mr. Bernal, the government also considered his "significant childhood trauma and abuse" as a further mitigating factor. *Id*. Sadly, Mr. Gonzales shares that history in common with Mr. Bernal as well.

As noted above, the San Jose CAP team's decision not to extend an invitation to Mr. Gonzales was due to concerns that his significant mental health issues and absence of an acute addiction problem at the time of his assessment were not a good fit for CAP. Judge Davila specifically expressed his hope that Mr. Gonzales might still avoid a prison sentence through another alternate program, which is precisely what he did. Mr. Gonzales has met all the goals of the robust plan that he created and meticulously followed. The point of this comparison is not that Mr. Bernal was not worthy of the generous variance that he received. It is that Mr. Gonzales is equally worthy. Like Mr. Bernal, he deserves a time-served sentence as recognition for his impressive achievements. If the Court wishes to differentiate between him and other co-defendants in some way based on the government's view of their relative culpability, it can exercise its discretion to impose a longer period of supervised release, or impose a condition that Mr. Gonzales perform community service. But a further prison sentence for Mr. Gonzales would create an unwarranted sentencing disparity.

### C. Severe Physical Health Issues

The Court should also consider a variance based on Mr. Gonzales's poor physical health. Mr. Gonzales's health is tenuous at best. After being diagnosed with Graves' Disease in October 2023, he has had three lengthy hospital stays. It has been difficult to find the appropriate medication and dosage to manage the various health risks that come with this disease—including, in Mr. Gonzales's case, weight loss of more than 30 pounds, a dangerously high heart rate and risk of stroke, and involuntary

hand tremors. PSR ¶ 72. This challenge is compounded by Mr. Gonzales's daily Suboxone dependency,[4] as the efficacy of any medication depends on how it interacts with Suboxone. If Mr. Gonzales is sentenced to time in custody, there is no guarantee that his medications can continue without interruption, and if those medications are interrupted, Mr. Gonzales faces serious health dangers, including the risk of stroke and other heart complications. *Id.* ¶ 67.

### D. Overstated Criminal History

Mr. Gonzales agrees with Probation that his Criminal History Category "appears to be overstated, due to the fact that his prior convictions are related to driving under the influence." *Id.* ¶ 115. Mr. Gonzales has one felony conviction and has never been to prison. His record is more aligned with a Criminal History Category II defendant, which would yield an indicated Guidelines range of 121 to 151 months. The Court may consider his overstated Criminal History as a basis for granting a variance.

### E. Pre-trial Release Credit

Mr. Gonzales was effectively on house arrest for over two years, from November 19, 2019 through January 25, 2022, during which he was subject to home-detention and electronic-monitoring conditions. Dkt. Nos. 23, 104. His only violation occurred in June 2022, when he inadvertently strayed outside the sanctioned perimeter to pet a dog on the sidewalk next to his house. (The Court took no action.) *See* Dkt. No. 62. Although Mr. Gonzales is not entitled to BOP credit for this time, he respectfully submits that the custodial-like conditions he experienced during this period should be recognized as a basis for a further variance here.

### F. Family Support

Through his current counseling and journaling as part of his deferred-sentencing plan, Mr. Gonzales has worked hard on establishing healthier relationships with his family, who support and love him. Even at his lowest, Mr. Gonzales has always taken care of his family, particularly his children, of whom he is incredibly proud. *See* Kane Decl. Ex. C at 2. His kids chose to live with him after he

---

[4] Dr. Goldman has impressed upon Mr. Gonzales that he needs to take Suboxone every day, so that he can function notwithstanding his opiate-withdrawal symptoms. Kane Decl. ¶ 2. Also, given Mr. Gonzales's past level of opiate dependence, Dr. Goldman does not anticipate that he will ever be weaned off Suboxone. *Id.*

separated from their mother. Mr. Gonzales welcomed that because his ex-wife's addiction led to unacceptable volatility. He strove to create a stable home for them, encouraged their higher education, and supported their professional ambitions. He continues to enjoy strong relationships with his children as adults as he explains: "Watching them thrive motivates me to keep improving myself and reinforces the positive changes I am making." *Id*. His daughter, now a mother herself, lives outside of Salinas, but Mr. Gonzales stays in regular contact with her and his grandkids. Mr. Gonzales is also a significant financial and emotional support to his adult son, who currently lives with him. Mr. Gonzales has worried that his son might be falling into some of the negative behavior patterns that he experienced, self-medicating through alcohol and marijuana, and he has tried to serve as a role model so that his son makes better choices.

Mr. Gonzales lives with his mother Sally and his brother Reuben Jr. As Sally recognizes, Mr. Gonzales went through several traumatic events during his childhood, and she knows him to be the "intelligent, smart, kind-hearted and very giving" son who "ma[de] a mistake." PSR ¶ 67. Reuben Jr. affirmed that their collective childhoods were "terrible" and that his brother is "honest" and "caring," someone who is "a good father towards his children" and "takes work very seriously." *Id.* ¶ 69. Reuben Jr., who according to Mr. Gonzales continues to struggle with his own addiction, emphasized how proud he is of Mr. Gonzales for staying clean, encouraging Reuben Jr.'s own son to stop drinking, and becoming "the total opposite of what [Mr. Gonzales] used to be" now that he is sober. *Id.* These family relationships are complicated, both because of their difficult shared history and because his mother and brother grapple with their own addiction issues. Still, forgiveness and re-building these connections are both critical to Mr. Gonzales's ongoing rehabilitation and provide another basis for a downward variance.

G. <u>Extraordinary Post-Offense Rehabilitation</u>

Mr. Gonzales's extraordinary post-offense rehabilitation is laudable on its own, but when considered through the lens of his childhood trauma, it is staggering and arguably the most persuasive ground for the steep downward variance sought here.

First, Mr. Gonzales's performance on pre-trial release has been exemplary, leading to the gradual removal of the most severe conditions as described above. Mr. Gonzales has repeatedly evidenced his strong commitment to remaining on the positive path that he has set for himself over the past five years. Even before he designed a deferred-sentencing plan, Mr. Gonzales was already taking steps towards self-improvement: managing his addiction, holding a job, connecting with his family, and following the rules imposed by the Court.

Mr. Gonzales is not merely checking boxes to convince the Court that he deserves a time-served sentence. He has reframed his attitude from the ground up. Mr. Gonzales appreciates the distinction: "Initially, my motivation to change stemmed from the desire to avoid prison. However, I quickly learned that true change requires taking responsibility for my actions and being honest with myself daily." *See* Kane Decl. Ex. C at 3. The deferred-sentencing plan has been instrumental in helping Mr. Gonzales build a strong foundation of life skills which will serve him well beyond this case. Mr. Gonzales has developed a routine that gives him the tools and structure he needs to stay on track, and he has strictly followed that routine. He manages his addiction with consistent counseling and therapy. He regularly takes advantage of important resources like NA and has cultivated a meaningful connection with his sponsor. Also, despite the setbacks and interruptions caused by his serious health issues, Mr. Gonzales has managed to stay employed to the fullest extent possible. In fact, he has thrived in his current car-dealership position and had received a promotion. As his current manager (and NA sponsor) explains, Mr. Gonzales is not only "a great salesman with stellar work ethic and punctuality," but also "[a] man with integrity" who stresses about problems at work "because he is genuinely concerned about the wellbeing of his customer, as well as keeping his word." *See* Kane Decl. Ex. B.

Most importantly, Mr. Gonzales's successes since his arrest in this matter have dramatically altered his world view. CBT has helped him to better understand that while he is responsible for his past actions, there is also an explanation for them which is rooted in his early life experiences. That revelation has allowed him to forgive himself and has made him less inclined to blame others or "the system" for his circumstances. ("Confronting this part of my past is challenging, but it's a truth I must accept in order to rebuild my life and move forward in a healthier, more positive direction." *See* Kane

Decl. Ex. C at 3.) Mr. Gonzales can now see a future for himself beyond this case and he has begun setting personal and professional goals. He hopes to switch from a sales role to the financing side of the car dealership where there are better opportunities to earn more money. *Id.* The increase in salary will allow him to move out of his mother's house—something that he has long wanted, but deferred pending the outcome of this case. What Mr. Gonzales looks forward to most is normalcy. He wants to be able to continue to reintegrate into law-abiding society: to socialize with work colleagues, to reconnect with family, to date. As Ms. Cortez notes, a return to custody would be a step in the wrong direction given Mr. Gonzales's stellar post-offense rehabilitation and the need for continued support through ongoing counsel and treatment. Kane Decl. Ex. A.

## VI. CONCLUSION

For the reasons above, Mr. Gonzales respectfully requests that the Court impose a time-served sentence with three years of supervised release.[5]

DATED: October 2, 2024

Respectfully submitted,

CONRAD | METLITZKY | KANE LLP

*/s/ Miranda Kane*
MIRANDA KANE
GRACE YANG

Attorneys for DEFENDANT GONZALES

---

[5] If the Court does determine that a prison sentence is appropriate, Mr. Gonzales requests that he be allowed to self-surrender to a designated BOP facility.